IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-01840-RBJ-CBS

ROBIN VERNON,
RORY PATRICK DURKIN,
BYRAN SANDQUIST, and
TED MOORE, on behalf of themselves and all others similarly situated,
        Plaintiffs,
v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation;
QWEST SERVICES CORPORATION, a Colorado corporation;
QWEST CORPORATION, a Colorado corporation;
QWEST COMMUNICATIONS CORPORATION, a Delaware corporation; and
QWEST BROADBAND SERVICES, INC., a Delaware corporation;
        Defendants.

---

**ORDER ON DEFENDANTS' RENEWED
MOTION TO COMPEL ARBITRATION**

---

Magistrate Judge Shaffer

        THIS MATTER comes before the court on Defendants Qwest Communications

International, Inc., Qwest Services Corporation, Qwest Corporation, Qwest Communications

Corporation, and Qwest Broadcast Services, Inc.'s (collectively "the Qwest Defendants" or

"Qwest") Renewed Motion to Compel Arbitration (doc. #132) filed on May 25, 2001.  Plaintiffs

Robin Vernon, Rory Patrick Durkin, Byran Sandquist and Ted Moore filed their Response to

Defendants' [Renewed] Motion to Compel Arbitration (doc. #138) on June 15, 2011, and

Plaintiffs' Designation of Supplemental Authority (doc. #150) on September 30, 2011.  The

Qwest Defendants filed a Reply in Support of their Renewed Motion to Compel Arbitration (doc.

#144) and their Designation of Supplemental Authority (doc. #151) on July 5, 2011 and October

1

2, 2011, respectively.  Plaintiffs filed yet another Designation of Supplemental Authority (doc. #161) on February 28, 2012 to apprise this court of a recent Opinion and Order entered in a very similar case, *Richard Grosvenor v. Qwest Corporation, et al.*, Civil Action No. 09-cv-02848-MSK-KMT.

Pursuant to an Order of Reference to Magistrate Judge (doc. #8) dated August 11, 2009, this matter was referred to the Magistrate Judge to, *inter alia*, "hear and determine pretrial matters, including discovery and other non-dispositive motions," and to "conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions."  The court heard oral argument on the pending motion during a hearing on October 7, 20011.  I have carefully reviewed the parties' briefs and attached exhibits, the entire case file, and the applicable case law, and considered the arguments presented at the October 7, 2011 hearing.

## PROCEDURAL BACKGROUND

While the parties are well versed in the underlying circumstances of the pending litigation, a brief recitation of its procedural history may assist the uninitiated reader.  This action was transferred from the Western District of Washington to the District of Colorado on August 4, 2009 following dismissal with prejudice of Plaintiffs' first claim for relief, and dismissal without prejudice of Plaintiff Vernon's claims for unjust enrichment and violation of Washington's Consumer Protection Act, as well as Plaintiff Durkin's claim under the Minnesota Prevention of Consumer Fraud Act.  *See* doc. #65.  When the case was transferred, Plaintiffs' First Amended Complaint was the operative pleading.

Plaintiffs filed their Second Amended Class Action Complaint (doc. #20) on September

2, 2009, as a "multi-state consumer class action on behalf of Qwest internet service customers who are subject to an invalid $200 Early Termination Fee ('ETF') if they cancel their internet service before the end of a purported contractual commitment, in most cases, two years." Plaintiffs asserted that the $200 fee was imposed regardless of the customer's reasons for cancelling service, the time remaining on the subscriber's alleged commitment, and "the lack of an agreement signed by the customer agreeing to such terms."  The Second Amended Class Action Complaint asserts claims for declaratory relief (Count One on behalf of all Plaintiffs), unjust enrichment (Count Two on behalf of all Plaintiffs), violation of the Colorado Consumer Protection Act (Count Three on behalf of all Plaintiffs), and violation of the Washington Consumer Protection Act (Count Four on behalf of Plaintiffs Vernon and Sandquist).  Plaintiffs specifically seek a declaration that the arbitration and class action waiver provisions and the alleged ETF imposed by Qwest on its customers are unenforceable, violate public policy, and are unconscionable, injunctive relief as to the same provisions, and an award of actual, statutory, exemplary damages, and attorneys fees and costs.

The Qwest Defendants filed a Motion to Compel Arbitration (doc. #26) on September 15, 2009, arguing that Plaintiffs' claims all arise out of and are subject to the parties' Subscriber Agreement and its mandatory arbitration clause.  In summary, the Qwest Defendants assert that, based upon Plaintiffs' consent to the terms and conditions of the Subscriber Agreement, the arbitration clause is enforceable under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, and that federal and Colorado law preclude a finding of unconscionability as to the arbitration clause's class action ban.  Briefing on that motion did not close until September 7, 2010 with the filing of Defendants' Notice of Supplemental Authority in Support of Their Motion to Compel

Arbitration (doc. #107).

In the mean time, Plaintiffs filed their Third Amended Class Action Complaint (doc. #54) on November 5, 2009.  The Third Amended Class Action Complaint

> (1) amend[s] the allegations of Plaintiff Ted Moore to reflect his recent payment of the ETF; (2) amend[s] the allegations of Plaintiff Bryan Sandquist to make clear he paid the ETF after he moved to Washington; (3) amend[s] the allegations of Plaintiffs Robin Vernon, Bryan Sandquist and Ted Moore to allege facts relating to the materiality of Qwest's failure to disclose the term commitment and ETF, as well as the anxiety and stress they suffered as a result of Qwest's attempts to collect the invalid ETFs; and (4) amend[s] Plaintiffs' claim under the Colorado Consumer Protection Action (sic) to clarify the basis of their claim that Qwest's conduct is "unfair and deceptive."

*See* Plaintiffs' Motion to Amend Second Amended Class Action Complaint (doc. #41), at 2.

On September 8, 2010, the Qwest Defendants filed a Motion to Stay Ruling on Defendants' Motion to Compel Arbitration (doc. #109), in light of the United States Supreme Court's decision to grant certiorari in *AT&T Mobility, LLC v. Concepcion*, __ U.S. __, 130 S.Ct. 3322 (May 24, 2010) to address whether the FAA preempts states from invalidating arbitration clauses that include a class action ban.  The district judge granted that motion with an Order (doc. #110) dated September 29, 201, staying this action "through the Supreme Court's resolution of *AT&T Mobility, LLC v. Concepcion*" and striking the Qwest Defendants' then-pending Motion to Compel Arbitration, "with leave to re-file within twenty-one days of the Supreme Court's" decision in *Concepcion*.  Consistent with the district court's directive, the Qwest Defendants filed their Renewed Motion to Compel Arbitration on May 25, 2011.  The associated briefing and attached exhibits comprise more than 732 pages of the court record.

## ANALYSIS

As a threshold matter, this court must address its authority under 28 U.S.C. § 636.   A review of the case law reveals that courts are divided on whether motions to compel arbitration are dispositive for purposes of 28 U.S.C. § 636(b)(1).  *Compare Wilken Partners, L.P. v. Champps Operating Corp.*, 2011 WL 1257480, at *1 (D. Kan. 2011) (noting that "district courts that have considered the nature of an order to stay proceedings pending arbitration and to compel arbitration have concluded that these are non-dispositive orders") and *Coxcom, Inc. v. Egghead Telecom, Inc.*, 2009 WL 4016629, at *1 (N.D. Okl. 2009) (suggesting that "[c]ourts generally regard a motion to compel arbitration either as a case dispositive matter or a matter not within the statutory authority of a U.S. Magistrate Judge to resolve by Order").  *See also Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394, 399 n.1 (S.D.N.Y. 2011) (finding persuasive those cases concluding that motions to compel are not case-dispositive) and *BBCM, Inc. v. Health Systems International, LLC*, 2010 WL 4607917, at *1 n.1 (N.D. Iowa 2010) (the magistrate judge, after noting a split of authority, issued a report and recommendation "out of an abundance of caution").

Unfortunately, the Tenth Circuit has not weighed in on this precise issue.  In the absence of controlling authority, I am persuaded by Magistrate Judge Bostwick's analysis in *Jackman v. Jackman*, 2006 WL 3792109, at *1-2 (D. Kan. 2006).  There, as in this case, the arbitration provision in question explicitly stated that the arbitration would be governed by the Federal Arbitration Act and that judgment on any arbitration award may be entered by any court of competent jurisdiction.  The arbitration provision in the Qwest Subscriber Agreement also acknowledges that "[a]rbitration is final and binding" and will be "conducted by the American

Arbitration Association ("AAA")."  Judge Bostwick noted that in *P & P Industries, Inc. v. Sutter Corp.*, 179 F.3d 861, 866-67 (10th Cir. 1999), the Tenth Circuit held that a district court has the authority to confirm an arbitration award pursuant to Section 9 of the FAA where the parties "have agreed, explicitly or implicitly, that any eventual arbitration award shall be subject to judicial confirmation."  That implicit consent may be evidenced by the parties' acknowledgment that the arbitration shall be final and binding, or by their agreement that the arbitration shall be governed by the rules and procedures of the AAA.  *Id.  Cf. Will v. Parsons Evergreene, LLC*, 2011 WL 2792398, at *1 (D. Colo. 2011) (concluding that the district court was the appropriate forum from which to obtain an order confirming an arbitration award where the parties' arbitration agreement stipulated that the arbitration award would be final and binding, and that judgment on the award "may be entered in any federal or state court having jurisdiction").  Judge Bostwick concluded that "because an Article III judge will ultimately be required to confirm, modify, or vacate any arbitration award, the order to stay proceedings and compel arbitration is non-dispositive and is within the magistrate's authority."  *Jackman v. Jackman*, 2006 WL 3792109, at *2.

The Tenth Circuit has held that a motion may be considered dispositive for purposes of 28 U.S.C. § 636(b)(1) if it has an "identical effect" as one of the motions excepted in that statute.  *First Union Mortgage Corp. v. Smith*, 229 F.3d 992, 995 (10th Cir. 2000), citing *Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1462 (10th Cir. 1988).  Measured by that standard, I find that the instant motion to compel arbitration is non-dispositive, as an Article III judge ultimately will be required to confirm, modify or vacate any arbitration award involving the parties to this

action.[1] *Cf. All Saint's Brands, Inc. v. Brewery Group Denmark, A/S*, 57 F. Supp.2d 825, 833 (D. Minn. 1999); *Herko v. Metropolitan Life Insurance Co.*, 978 F. Supp. 141, 142 n.1 (W.D.N.Y. 1997)

Turning to the substance of the parties' arguments, the Qwest Defendants insist that the arbitration clause as drafted is fully enforceable under recent Supreme Court precedents. Relying on the decisions in *AT&T Mobility, LLC. v. Concepcion*, __ U.S. __, 131 S.Ct. 1740 (2011) and *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, __ U.S. __, 130 S.Ct. 1758 (2010), Qwest maintains that consumer plaintiffs cannot invalidate arbitration agreements that preclude class actions by raising state law unconscionability arguments, and cannot force an opposing party to arbitrate claims on a class basis unless the parties expressly agreed to incorporate class procedures in the arbitration provision itself.  Defendants assert that Plaintiffs freely entered into a binding contract after receiving legally sufficient notice of the terms of the Subscriber Agreement, and cannot now avoid their contractual obligations by suggesting the arbitration clause is unconscionable because of the procedural and substantive ramifications of the arbitration process.

In summary, Plaintiffs raise various arguments in opposition to the Renewed Motion to Compel Arbitration.  Plaintiffs insist that the agreement to arbitrate is unenforceable because the Subscriber Agreement containing the arbitration provision was never actually presented to customers.  Plaintiffs also argue that the dispute resolution provision is illusory to the extent that Qwest reserved to itself the unfettered right to amend the arbitration provision.  Plaintiffs argue

---

[1]Should the district judge reach a different conclusion as to the applicability of 28 U.S.C. § 636(b)(1)(A), my decision may be reviewed *de novo* pursuant to Fed. R. Civ. R. 72(b)(3).

7

that the dispute resolution provision is both procedurally and substantively unconscionable, and,

therefore, unenforceable.  Finally, Plaintiffs assert that Defendants waived their right to compel

arbitration by filing motions to dismiss in this action.

The "liberal federal policy favoring arbitration" is well-recognized.  *Moses H. Cone*

*Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (2008), *superseded by statute*

*on other grounds by* 9 U.S.C. § 16(b)(1).  As arbitration typically is a matter of contract, *see*

*Rent-A-Center, West, Inc. v. Jackson*, __ U.S. __, 130 S.Ct. 2772, 2776 (2010), in deciding

whether there is an enforceable agreement to arbitrate, "courts generally . . . should apply

ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago,*

*Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  The court's application of state law principles must

also give "due regard . . . to the federal policy favoring arbitration."  *Volt Information Sciences,*

*Inc. v. Board of Trustees*, 489 U.S. 468, 475-76 (1989).  *See also J.A. Walker Co., Inc. v.*

*Cambria Corp.*, 159 P.3d 126, 128 (Colo. 2007) ("Colorado law favors the resolution of disputes

through arbitration.").  However, the Federal Arbitration Act provides that arbitration

agreements may be unenforceable "upon such grounds as exist at law or in equity for the

revocation of any contract."  *See* 9 U.S.C. § 2.  Grounds for invalidating an arbitration agreement

would include "generally applicable contract defenses, such as fraud, duress, or

unconscionability."  *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996).  Thus,

a court may refuse to enforce an arbitration agreement where the non-moving party presents

"well supported claims that the agreement to arbitrate resulted from the sort of fraud or

overwhelming economic power that would provide grounds 'for the revocation of any contract.'"

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985) (but noting

8

that "absent such compelling considerations, the [FAA] itself provides no basis for . . . skewing the otherwise hospitable inquiry into arbitrability").

Recent Supreme Court decisions have considered the scope and enforceability of arbitration provisions in commercial and consumer contracts.  In *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, __ U.S. __, 130 S.Ct. at 1773, the Supreme Court re-affirmed that "arbitration 'is a matter of consent, not coercion'" and that "private agreements to arbitrate are enforced according to their terms."  Given that parties are "generally free to structure their arbitration agreements as they see fit," the Supreme Court concluded that under the FAA, a party cannot be compelled to submit to class arbitration unless "there is a contractual basis for concluding that the party *agreed* to do so."  *Id.* at 1775 (emphasis in original).  Less than two months later, in *Granite Rock Company v. International Brotherhood of Teamsters*, __ U.S. __, 130 S.Ct. 2847, 2859 (2010), the Supreme Court acknowledged that the presumption favoring arbitration in the FAA "reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed . . .and is legally enforceable."

Last year, the Supreme Court again addressed the enforceability of arbitration provisions with its decision in *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. at 1740.  In that case, the Ninth Circuit had held that a consumer arbitration clause was unconscionable because the provision disallowed classwide arbitration proceedings.  Under California law, a court may decline to enforce any contract found "to be unconscionable at the time it was made" or may "limit the application of any unconscionable clause."  *Id.* at 1746.  In reversing the Ninth Circuit and finding that California law was preempted by the Federal Arbitration Act, the Supreme

Court observed that

> The "principle purpose" of the FAA is to "ensur[e] that private arbitration agreements are enforced according to their terms.  This purpose is readily apparent from the FAA's text. . . . In light of these provisions, we have held that parties may agree to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit *with whom* a party will arbitrate its disputes.
> The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute.

*Id.* at 1749 (emphasis in original) (internal citations omitted).  From this essential premise, the Supreme Court concluded that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id.* at 1748.  The Supreme Court acknowledged the economic reality that lawyers would have "little incentive . . . to arbitrate on behalf of individuals when they may do so for a class and reap far higher fees in the process."  *Id.* at 1750.  However, the Court also recognized that class-wide arbitration would sacrifice the informality of arbitration and inevitably make "the process slower, more costly, and more likely to generate procedural morass than final judgment."  *Id.* at 1751.

A.     *The Factual Record*

Although the parties understandably have differing views as to the appropriate legal analysis, the underlying facts are largely undisputed.

In December 2005, following the deregulation of the high speed internet services industry, Qwest sent letters to all of its internet subscribers explaining that their service would henceforth be governed by a Subscriber Agreement.  This letter explained that existing customers who made no changes to their service would become subject to the new Subscriber Agreement on November 16, 2006.  Customers who made any changes to their service, such as

upgrading to high speed internet, would be governed by the Subscriber Agreement at the time

those changes were made.  The December 2005 letter advised customers that with transfer of

their service to the new Subscriber Agreement, "Qwest will assume you have accepted these

terms unless you contact Qwest within 30 days of your transfer date."  Customers also were told

that "more information on Qwest High-Speed Internet service terms and conditions" could be

found "at www.qwest.com/legal."  The Qwest Defendants insist that "[a] customer who did not

want to be governed by the Subscriber Agreement was allowed to cancel their service without

penalty."  *See* Affidavit of Travis Leo in Support of Defendants' Motion to Compel Arbitration

(doc. #27), at ¶8 and Exhibit A thereto.

     The Subscriber Agreement informs subscribers that

> BY ENROLLING IN, ACTIVATING, USING OR PAYING FOR THE
> SERVICE AND/OR EQUIPMENT, FAILING TO RETURN THE EQUIPMENT
> AND CANCEL SERVICE WITHIN 30 DAYS AFTER ORDERING SERVICE
> OR EQUIPMENT, OR INSTALLING THE EQUIPMENT YOU AFFIRM THAT
> YOU UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS IN
> THIS AGREEMENT, EVEN IF YOU CHOOSE NOT TO READ IT.
> FURTHER, YOU AFFIRM THAT YOU UNDERSTAND AND AGREE TO
> THE PRICES, CHARGES, AND OTHER TERMS AND CONDITIONS
> QUOTED TO YOU DURING THE ORDERING PROCESS AND ON
> www.qwest.com/legal/highspeedinternetsubscribers agreement/ and
> www.qwest.com/legal, ALL OF WHICH ARE INCORPORATED BY
> REFERENCE.

*Id.* at ¶16 and Exhibit B thereto.

     The Subscriber Agreement expressly provides that all disputes other than those related

solely to collection of debt shall be resolved through individual arbitration or proceedings in

small claims court:

> 17.  **Dispute Resolution and Arbitration; Governing Law**.  PLEASE READ
> THIS SECTION CAREFULLY.  IT AFFECTS RIGHTS THAT YOU MAY
> OTHERWISE HAVE. IT PROVIDES FOR RESOLUTION OF DISPUTES

THROUGH MANDATORY ARBITRATION WITH A FAIR HEARING
BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A
JUDGE OR JURY OR THROUGH A CLASS ACTION.

(a)  <u>Arbitration Terms</u>.  You agree that any dispute or claim arising out of or
relating to the Services, Equipment, Software, or this Agreement (whether based
in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be
resolved by binding arbitration. The sole exceptions to arbitration are that either
party may pursue claims: (1) in small claims court that are within the scope of its
jurisdiction, provided the matter remains in such court and advances only
individual (non-class, non-representative, non-consolidated) claims; and (2) in
court if they relate solely to the collection of any debts you owe to Qwest.

> (i)  *Arbitration Procedures*. . . . The arbitration shall be conducted by the
> American Arbitration Association ("AAA"). The Federal Arbitration Act,
> 9 U.S.C. Sections 1-16, not state law, shall govern the arbitration of the
> dispute. Colorado state law, without regard to choice of law principles,
> shall otherwise govern and apply to any and all claims or disputes . . . .
> Arbitration is final and binding. Any arbitration shall be confidential and
> neither you nor Qwest may disclose the existence, content or results of
> any arbitration, except as may be required by law or for purposes of
> enforcement of the arbitration award. The arbitrator may award any relief
> or damages that a court could award, except an arbitrator may not award
> relief in excess of or contrary to what this Agreement provides. Judgment
> on any arbitration award may be entered in any court having jurisdiction.

> (ii)  *Costs of Arbitration*.  The party requesting arbitration must pay the
> applicable AAA filing fee, except that if you are an individual using the
> Services for household or personal use and you initiate arbitration against
> Qwest: (1) you must pay one-half the arbitrator's fee up to a maximum of
> $125 if your claim does not exceed $10,000; (2) you must pay one-half the
> arbitrator's fees up to a maximum of $375 if your claim is more than
> $10,000 but less than $75,000; and (3) you must pay an Administrative
> Fee in accordance with the AAA's Commercial Fee Schedule if your
> claim exceeds $75,000, or if your claim is non-monetary.  Except as
> provided in the preceding sentence, each party shall pay its own expenses
> of the arbitration, including the expense of its own counsel, witnesses, and
> presentation of evidence at the arbitration.

* * *

(b)  <u>Waiver of Jury and Class Action</u>.  By this Agreement, both you and Qwest
are waiving rights to litigate claims or disputes in court (except small claims court
as set forth in paragraph (a) above). Both you and Qwest also waive the right to a

> jury trial on your respective claims, and waive any right to pursue any claims on a
> class or consolidated basis or in a representative capacity.

*Id.* (emphasis in original).

Starting in the spring of 2006, Qwest introduced a new "Price for Life" program under

which subscribers who agree to purchase high speed internet service for at least two years are

guaranteed a discounted rate for as long as they maintain their high speed internet service

without change. Subscribers who decline to make that two-year commitment are subject to

potential rate increases for their monthly service. Price for Life subscribers who terminate the

contract before the two-year period expires are required to pay a $200 early termination fee. *Id.*

According to the Qwest Defendants, a customer who signs up for the Price for Life

program over the telephone first speaks to a customer service representative. Once the customer

selects their internet service package, they are transferred to a voice prompt system which

explains that the customer has selected a multi-year package that is governed by the terms of the

Subscriber Agreement. The automated voice prompt reiterates that the customer has "selected a

multi-year agreement for your Qwest High-Speed Internet service," the "terms and conditions [of

which] are located at www.qwest.com/legal." The voice prompt also tells the subscriber that

"you can always cancel the service within 30 days without any early termination charge." *Id.* at

¶¶ 17 and 18 and Exhibit C thereto.

A customer who enrolls in or upgrades their service via the internet cannot complete the

enrollment checkout process without clicking "I agree" to a box of "Terms and Conditions"

appearing on their computer monitor. The text informs the customer that the terms and

conditions of their service are set forth in the Subscriber Agreement and asks the customer to

"please review the terms, which include arbitration and limits on Qwest liability." Later on the

same "checkout" page, the customer is told that "your Internet services and equipment are offered under terms found at www.qwest.com legal/; click Broadband Subscriber Agreement. Please review the terms, which include arbitration and limits on Qwest liability.  If you do not agree, call Qwest to cancel your service within 30 days."  *Id.* at ¶19 and Exhibit D thereto.

A customer who purchases internet service is required to install the necessary software using a QuickConnect installation disc.  *Id.* at ¶20 and Exhibit E thereto.  When the installation disc is loaded into a computer, a window appears on the screen stating:

> Please read the Qwest High-Speed Internet (also called Qwest Broadband) Subscriber Agreement terms, ***including arbitration and limits on Qwest liability***, at ww.qwest.com/legal ("Qwest Agreement") that govern your use and Qwest provision of the service(s) and equipment you ordered from the list below.
>
> ♦    Qwest High-Speed Internet service . . .
>
> Please also read the (1) information on term and early termination fee . . .

*Id.* (emphasis in original).  The same window informs the customer that "[y]ou may get a paper copy of the agreements free of charge by printing them from this page and www.qwest.com/legal."  The customer is told that "[y]our click on the radio button labeled 'I accept the terms of the license agreement' is an electronic signature and acknowledges:  (1) you agree the Qwest Agreement contains the terms under which service and equipment are offered and provided to you, (2) you understand and agree to such terms (even if you don't read them) . . . ."  Customers cannot complete the software installation process without accepting the terms of the Subscriber Agreement, however, upgrading to high-speed internet service does not require reinstallation of the software.  *Id.*

The Qwest Defendants claim that every customer who places an order for Qwest service

receives a Welcome Letter.  *Id.* at ¶21 and Exhibit F thereto.  The Welcome letter expressly asks the customer to **"\*\*Please review the important information enclosed and on the back of the letter about security codes, services and terms for use**."  Elsewhere, the Welcome Letter notes that the customer's internet "service and related products are offered under the High-Speed Internet Subscriber Agreement terms, which are located at www.qwest.com/legal/highspeedinternetsubscriberagreement.  Please review the terms, which include arbitration and limits on Qwest liability.  If you do not agree, call Qwest to cancel your service within 30 days."  *Id.* (emphasis in original).

According to Qwest, all customer orders placed over the telephone or via the internet are entered into Qwest's Service Order Processing Software with a universal service order code corresponding to the service or product ordered.  Qwest then employs a mechanized process to generate a Welcome Letter conforming to the customer's specific order.  In 2006, 2007 and 2008, Qwest's vendor, RR Donnelley Business Communications Services ("BCS") retrieved from a secure, internet-accessible site information concerning residential orders.  BCS then processed Welcome Letters using a template and instructions provided by Qwest, inserted those Welcome Letters into envelopes and sent out the Welcome Letters by mail.  *See* Affidavit of Brian Bennett, attached as Exhibit 12 to Defendants' Renewed Motion to Compel Arbitration. Qwest believes, based upon established quality assurance protocols and available BCS records, that Welcome Letters were sent to Plaintiffs Vernon, Durkin, Sandquist and Moore.  *See* Affidavit of Lucia Beardsley, attached as in Support of  Defendants' Motion to Compel Arbitration (doc. #82-5).

Plaintiff Robin Vernon and her husband initially ordered internet service from Qwest in

2005 and enrolled in the Price for Life program over the internet in April 2007. *Id.* at ¶9. *See also* Affidavit of Jesse Kohler in Support of Defendants' Motion to Compel Arbitration (doc. #82-1) at ¶6. The Vernons canceled that service in May 2008. One week later, Ms. Vernon received a bill that included a $200 fee for cancellation of their internet service. During her deposition, Ms. Vernon could not recall receiving a Welcome Letter and insisted that she never received a written contract for her internet service. *See* Deposition of Robin Vernon, at 26, marked as Exhibit 5 (doc. #132-5) to Defendants' Renewed Motion to Compel Arbitration. Defendants maintain that Qwest's records show that the Vernons affirmatively accepted the Subscriber Agreement by clicking "accept" while configuring their computer for high-speed internet service. *See* Affidavit of Jesse Kohler in Support of Defendants' Motion to Compel Arbitration (doc. #82-1) at ¶¶ 7 and 8.

Plaintiff Durkin had been a Qwest internet customer since 2004, and in May 2007 contacted Qwest by telephone to upgrade to high-speed service. *See* Affidavit of Lucia Beardsley in Support of Defendants' Motion to Compel Arbitration (doc. #82-5) at ¶11. *See also* Affidavit of Jesse Kohler in Support of Defendants' Motion to Compel Arbitration (doc. #82-1) at ¶4. Mr. Durkin insists that he did not receive a written contract in 2007 or at any time thereafter. Mr. Durkin testified at his deposition that he could not recall receiving a Welcome Letter, but conceded that "if I received it, I wouldn't have gone and looked at the subscriber agreement anyway." *See* Deposition of Rory P. Durkin, at 39, attached as Exhibit 2 (doc. #132-2) to Defendants' Renewed Motion to Compel Arbitration. Plaintiff Durkin also acknowledged that he received the installation disc which he used to configure his computer. *Id.* at 23. *See also* Affidavit of Jesse Kohler in Support of Defendants' Motion to Compel Arbitration (doc.

#82-1) at ¶¶ 7 and 8. Asked if he affirmatively accepted the terms and conditions of the

Subscriber Agreement, Mr. Durkin testified that he "got the service and if that's the only way

that I can get the service, then I must have clicked it." *See* Deposition of Rory P. Durkin, at 45,

attached as Exhibit 2 (doc. #132-2) to Defendants' Renewed Motion to Compel Arbitration.

Although Mr. Durkin acknowledged that he was familiar with "click to accept" agreements, he

also said it was not his normal practice to review a contract before "click[ing] to accept." As

Durkin freely conceded, "Nobody does. It's ridiculous to." *Id.* at 43 and 46. Mr. Durkin also

testified that he "probably" did not print out the terms of the Subscriber Agreement while in the

process of configuring his computer. *Id.* at 89. When Mr. Durkin attempted to cancel his

internet service in February 2008, he was told he would have to pay a $200 termination fee.

Plaintiff Sandquist signed up for Qwest internet service over the telephone in July 2007.

*See* Affidavit of Lucia Beardsley in Support of Defendants' Motion to Compel Arbitration (doc.

#82-5) at ¶14. *See also* Affidavit of Jesse Kohler in Support of Defendants' Motion to Compel

Arbitration (doc. #82-1) at ¶4. Mr. Sandquist denies that he was transferred to a voice prompt

system, insisting instead that he placed his order with a live operator. Although Mr. Sandquist

does not specifically recall seeing a Welcome Letter, he could not definitively say whether or not

he received such a letter in the mail. *See* Deposition of Bryan S. Sandquist, at 20, attached as

Exhibit 4 (doc. #132-4) to Defendants' Renewed Motion to Compel Arbitration. Mr. Sandquist

admitted receiving an installation disc in the mail, which he used to install the high speed

internet software on his computer. *Id.* at 11. *See also* Affidavit of Jesse Kohler in Support of

Defendants' Motion to Compel Arbitration (doc. #82-1) at ¶¶ 7 and 8. Mr. Sandquist testified

that he understood that by hitting the "click to accept" button, he was entering into an agreement.

17

*See* Deposition of Bryan S. Sandquist, at 19, marked as Exhibit 4 (doc. #132-4) to Defendants'

Renewed Motion to Compel Arbitration.  After Plaintiff Sandquist cancelled his internet service

in December 2008, he received a bill that included a $200 termination charge.

Plaintiff Moore changed his Qwest high speed internet service in June 2006 with a

telephone call.  *See* Affidavit of Lucia Beardsley in Support of Defendants' Motion to Compel

Arbitration (doc. #82-5) at ¶16.  *See also* Affidavit of Jesse Kohler in Support of Defendants'

Motion to Compel Arbitration (doc. #82-1) at ¶4.  Mr. Moore testified that he understood that by

"clicking to accept," he was accepting the terms and conditions associated with that transaction.

*See* Deposition of Theodore Moore, at 103 and 104 attached as Exhibit 3 (doc. #132-3) to

Defendants' Renewed Motion to Compel Arbitration.  After Mr. Moore cancelled his internet

service in May or June of 2009, he received a final bill that included an early termination penalty

of $200.  Mr. Moore could not recall receiving a Welcome Letter, but insists, like the other

Plaintiffs, that he would not have knowingly agreed to a contract that included a two-year

commitment or an early termination penalty.

B.      *Whether Plaintiffs Agreed to the Arbitration Clause?*

Plaintiffs contend that they were never presented with the Subscriber Agreement and its

dispute resolution provision and, therefore, never assented to those terms.  "[A] party cannot be

required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T*

*Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (quoting

*Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  It necessarily

follows that "if there was never an agreement to arbitrate, there is no authority to require a party

to submit to arbitration."  *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 850

18

F.2d 756, 761 (D.C. Cir. 1988).

As the party seeking to compel arbitration, Qwest must come forward with "evidence sufficient to demonstrate an enforceable arbitration agreement." *See Smart-Text Corp. v. Interland, Inc.*, 296 F. Supp. 2d 1257, 1263 (D. Kan. 2003). The Qwest Defendants satisfied by presenting evidence sufficient to demonstrate the existence of an arbitration agreement. *Cf. Hines v. Overstock.com, Inc.*, 380 Fed. Appx. 22, 24 (2d Cir. 2010) (to sustain its prima facie burden, the party seeking to compel arbitration must simply show that an arbitration agreement existed, not that the argument would be enforceable). The burden thus shifts to Plaintiffs "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *See Grosvenor v. Qwest Communications International, Inc.*, 2010 WL 3906253, at *5 (D. Colo. 2010). I should compel arbitration if there is "'no genuine issue of fact concerning the formation of the agreement' to arbitration." *Kirleis v. Dicki, McCamey & Chilcote, P.C.*, 560 F.3d 156, 159 (3rd Cir. 2099). "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made by the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Municipal Water District v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3rd Cir. 1980).

"Generally, courts 'should apply ordinary state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute.'" *Hardin v. First Cash Financial Services, Inc.*, 465 F.3d 470, 175 (10th Cir. 2006). In determining whether a contract existed between the parties, "evidence of the parties' conduct, their oral statements and

their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo.1986).  "The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Pierce v. St. Vrain Valley School District RE-1J*, 981 P.2d 600, 603 (Colo. 1999).  While assent may be implied from the totality of circumstances and the acts of the parties, it must appear in some form.  *Mumm v. Adam*, 307 P.2d 797, 801 (Colo. 1957).  An party may demonstrate assent to the terms of an offer either by promising to perform or by actually performing.  *Industrial Products International, Inc. v. Emo Trans, Inc.*, 962 P.2d 983, 988 (Colo. App. 1997).  An objective manifestation of assent is not rebutted by that same party's uncommunicated, subjective intent.  *Avemco Insurance Co. v. Northern Colorado Air Charter, Inc.*, 38 P.3d 555, 559 (Colo. 2002).

While general contract formation principles and more specifically the requirement of mutual assent have not changed with the emergence of e-commerce, *see, e.g, Van Tasssell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770, 789 (N.D. Ill. 2011), courts are being asked to apply those common law principles to ever-evolving transactional settings.  Consumers may be presented with a "clickwrap" or "click-through" agreement in which the internet purchaser is required to affirmatively click an "I agree" box after being presented with a list of terms and conditions of use.  *See, e.g., Kwan v. Clearwire Corp.*, 2012 WL 32380, at *7 (W.D. Wash. 2012).

Alternatively, consumers may be presented with a "browsewrap" agreement, in which terms and conditions of use are posted on a website accessible through a hyerlink at the bottom

of the subscriber's computer screen.  *Id.*  Unlike the "clickwrap" agreement which requires a manifestation of assent through affirmative action, the consumer in a "browsewrap" agreement conveys assent simply by using the product.  Under either scenario, however, the threshold issue is the same:  did the consumer have reasonable notice, either actual or constructive, of the terms of the putative agreement and did the consumer manifest assent to those terms.  *Cf. One Beacon Insurance Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 268-69 (5th Cir. 2011).

Courts also have been confronted with hybrid arrangements, in which the customer must take affirmative action – pressing a "click" button – but, like a browsewrap agreement, the terms being accepted do not appear on the same screen as the accept button, but are available with the use of hyperlink.  Under this hybrid arrangement, the customer is told that consequences will necessarily flow from his assenting click and also is placed on notice of how or where to obtain a full understanding of those consequences.  *See, e.g., Fteja v. Facebook, Inc.*, 2012 WL 183896, at *10 (S.D.N.Y. 2012); *Swift v. Zynga Game Network, Inc.*, 2011 WL 3419499, at *7 (N.D. Cal. 2011) (finding formation of a valid contract where the software in question involved a "modified clickwrap" process in which the terms of service were not visible on the page but were accessible via a hyperlink).

Plaintiffs maintain that the Subscriber Agreement and arbitration clause were never "presented" to them during the ordering, welcoming and installation process.  Plaintiffs further contend that proper "presentation" or "delivery" of the Subscriber Agreement and arbitration clause required that these provisions "appear on the same scroll down or page as the 'I Accept' and the 'I Do Not Accept' buttons" during the installation process.  In advancing this argument, Plaintiffs' Response relies heavily on Judge Miller's September 30, 2010 Order in *Grosvenor v.*

21

*Qwest Communications International, Inc.*, 2010 WL 3906253 (D. Colo. 2010), which found there were genuine issues of material fact as to the circumstances under which Mr. Grosvenor agreed to the Subscriber Agreement.  After further discovery, the parties in *Grosvenor* filed new motions for summary judgment addressing whether Mr. Grosvenor and Qwest had a binding and enforceable agreement to arbitrate.  Judge Krieger[2] decided that issue with an Opinion and Order entered on   February 23, 2012.  In that Order, Judge Krieger concluded that Mr. Grosvenor objectively manifested his assent to contract terms that were clearly disclosed in the Welcome Letter sent to subscribers.  Judge Krieger's analysis of that issue is equally applicable to the facts in this case.

Where a party seeks to enforce terms or conditions incorporated by reference in a contract, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  *Taubman Cherry Creek Shopping Center, LLC v. Neiman-Marcus Group, Inc.*, 251 P.3d 1091, 1095 (Colo. App. 2010).  However, as noted previously, evidence of assent may be gleaned from the totality of the circumstances.  Under the particular facts of this case, I conclude that Plaintiff had reasonable notice of the Subscriber Agreement and the arbitration clause.

Qwest customers were made aware of the Subscriber Agreement through multiple communications.  The December 2005 letter sent to existing Qwest customers explained that high speed internet services would henceforth be governed by a Subscriber Agreement that could be found at "www.qwest.com/legal."  The same letter told customers they could cancel their

---

[2]With Judge Miller taking inactive senior judge status, Mr. Grosvenor's lawsuit was reassigned to Judge Krieger on August 2, 2011.

service without penalty if they did not wish to accept the terms and conditions set forth in that

Agreement.  The record indicates that Plaintiffs Vernon and Durkin were Qwest customers as of

December 2005.  Customers who signed up for the Price for Life program, either by telephone or

by internet, also were advised that they would be subject to the Subscriber Agreement that could

be found at "www.qwest.com/legal."  Customers who purchase internet services through Qwest

must install software.  The installation disc specifically informs subscribers that they should read

the Subscriber Agreement accessible at "www.qwest.com/legal."  The same window on the

installation program highlights for the customer the fact that the terms and conditions of the

service "includ[e] arbitration and limits on Qwest liability."  Each of the Plaintiffs concedes that

they received and used the installation disc and affirmatively clicked the "I accept" button.

Finally, Qwest has presented evidence indicating that a Welcome Letter was sent to each

Plaintiff.  That Welcome Letter, once again, urged the customer to review the terms and

conditions of their service set forth in the Subscriber Agreement "located at

www.qwest.com/legal."  *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1105 (C.D. Cal. 2002)

(holding that an arbitration agreement was enforceable even though the customer received the

contract after purchasing the necessary equipment and after the satellite programming had been

activated).

Defendants have offered evidence describing their routine practice of mailing Welcome

Letters to customers.  That evidence is sufficient to establish a *prima facie* showing that

Plaintiffs were made aware of the Subscriber Agreement.  *Cf. Schwartz v. Comcast Corp.*, 256

Fed. Appx. 515, 518-19 (3rd Cir. 2007) (holding that evidence of defendant's standard policy of

providing a "welcome packet" to its subscribers was relevant to show that the plaintiff did in fact

receive that material). *See also Campbell v. IBM Corp.*, 867 P.2d 77, 80 (Colo. App. 1993)

("There is a rebuttable presumption that a letter which was properly addressed, stamped and

mailed was duly delivered to the addressee.").

While the Subscriber Agreement and arbitration clause may not have been physically

presented to each Plaintiff[3] and did not automatically appear on the subscriber's computer screen

during the software installation process, those terms and conditions were not hidden or difficult

to find. *Cf. Schwartz v. Comcast Corp.*, 256 Fed. Appx. at 520 (holding that the parties were

bound by an enforceable agreement where the Subscriber Agreement was posted on defendant's

website at all times and, therefore, the terms of that Agreement were available to the plaintiff);

*Burcham v. Expedia, Inc.*, 2009 WL 586513, at *2 (E.D. Mo. 2009) ("[a] customer on notice of

contract terms available on the internet is bound by those terms"); *Bar-Ayal v. Time Warner

Cable Inc.*, 2006 WL 2990032, at *9-11 (S.D.N.Y. 2006) (while plaintiff may have been

required to scroll through 38 screens to review the Customer Agreement on defendant's website,

held that the Agreement "was not hidden or hard to find"). Even if Plaintiffs had only received

the Welcome Letter, at that point they were fully capable of finding the Subscriber Agreement

and arbitration provision on the Qwest website. *See Wildman v. Pacific Coast Independent

Brokerage, Inc.*, 2001 WL 881738, at *1-2 (9th Cir. 2001) (district court did not err in compelling

arbitration where non-movant failed to read documents containing arbitration provisions and had

reasonable opportunity to discover the terms of the contract); *Elsken v. Network Multi-Family*

---

[3]During the time frame, June of 2006, when Plaintiff Moore changed his Qwest high speed internet service, Qwest included the Subscriber Agreement with the Welcome Letter sent to the customer. *See* Affidavit of Lucia Beardsley (doc. #82-5) at ¶ 18, attached as Exhibit 5 to Defendants' Reply in Support of Their Motion to Compel Arbitration.

*Security Corp.*, 49 F.3d 1470, 1473-74 (10th Cir. 1995) (holding that plaintiff remained bound by provisions in a Services Agreement even though she did not read the contract).

While Plaintiffs Durkin, Sandquist and Vernon could not recall whether or not they received the Welcome Letter, that assertion is not sufficient to defeat the Qwest Defendants' motion. *Cf. Blau v. AT&T Mobility*, 2012 WL 10546, at *4 (N.D. Cal. 2012) (""If a party could get out of a contract by arguing that he did not recall making it, contracts wold be meaningless. It is not even relevant if Plaintiffs did not read the agreements before signing them."). *See also Spivey v. Adaptive Marketing LLC*, 622 F.3d 816, 820 (7th Cir. 2010) (holding that plaintiff's equivocal deposition testimony when asked whether he denied receiving defendant's welcome kit supported a presumption that the welcome kit actually was received); *Federal Kemper Life Assurance Co. v. Ellis*, 28 F.3d 1033, 1040 (10th Cir. 1994) (held that defendant's simple denial of receipt did not create an issue for the jury as to whether notice was mailed in the face of plaintiff's evidence of standard mailing procedures).

Colorado law recognizes that "one generally cannot avoid contractual obligations by claiming that he or she did not read the agreement." *Loden v. Drake*, 881 P.2d 467, 469 (Colo. App. 1994). *See also Barciak v. United of Omaha Life Insurance Co.*, 777 F. Supp. 839, 843 (D. Colo. 1991) (presumption that one who signs contract read and understood each of its terms). Plaintiffs cannot demonstrate a lack of mutual assent simply by claiming that they "cannot recall" seeing or reviewing the Subscriber Agreement at the time they accepted the benefits of the Price for Life program. While the Qwest Defendants undoubtedly could provide more "user friendly" access to the Subscriber Agreement, the undisputed facts in this case demonstrate that Plaintiffs had reasonable notice and access to the terms and conditions of the arbitration clause.

*Cf. One Beacon Insurance Co. v. Crowley Marine Services, Inc.*, 648 F.3d at 263 and 268-70 (holding that a party had reasonable notice of an arbitration clause, even though reviewing the pertinent terms and conditions required the party to access a website and then take several successive steps to pull up those terms and conditions).

Like Judge Krieger's Opinion and Order in *Grosvenor*, I also find that Plaintiffs Vernon, Durkin, Sandquist and Moore manifested their assent to the terms and conditions of the Subscriber Agreement and the arbitration provision therein.  It is undisputed that each of the Plaintiffs continued to use the high speed internet service for several months after installing the necessary software and receiving a Welcome Letter.  *Cf. Williams v. Metropcs Wireless*, 2010 WL 1645099, at *6 (S.D. Fla. 2010) (holding that the plaintiff was bound by the terms and conditions of an arbitration provision where she had access to her service plan and thereafter continued to pay her bills); *Burcham v. Expedia, Inc.*, 2009 WL 586513, at *3 (E.D. Mo. 2009) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree."); *Enderlin v. XM Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *6 (E.D. Ark. 2008) (holding that plaintiff had assented to an arbitration clause where he had an opportunity to read those terms and conditions on defendant's website and then continued to receive services from the defendant).  Based upon the factual record presented by the parties, I find Plaintiffs voluntarily accepted the Subscriber Agreement and the arbitration provision that the Qwest Defendants seek to enforce with the instant motion.

C.      *Whether the Arbitration Clause is Illusory?*

Even assuming they accepted the arbitration clause, Plaintiffs argue that denial of the Renewed Motion to Compel Arbitration is mandated by the Tenth Circuit's decision in *Dumais v. American Golf Corp*, 299 F.3d 1216, 1219 (10th Cir. 2002), which held that "an arbitration agreement allowing one party the unfettered right to alter [an] arbitration agreement's existence or its scope is illusory."  Plaintiffs' most recent Designation of Supplemental Authority further suggests that I should be guided by that portion Judge Krieger's recent Order in *Grosvenor*, which found that "Qwest retained an unfettered ability to modify the existence, terms and scope of the arbitration clause, [thus rendering the provision] illusory and unenforceable."  This court acknowledges, as Judge Krieger did in *Grosvenor*, an obligation to follow controlling Tenth Circuit precedent.  However, the doctrine of *stare decisis* does not override my responsibility to independently review and apply judicial precedents in light of the particular facts of this case. *Cf. Citizens United v. Federal Election Commission*, __ U.S. __, 130 S.Ct. 876, 920 (2010) (noting that "*stare decisis* is neither an 'inexorable command' nor 'a mechanical formula of adherence to the latest decision'").

Section 4 of the Subscriber Agreement states, in pertinent part, that subject to applicable rules and laws, Qwest may

> (a) at any time, effective upon posting to www.qwest.com/legal or any written notice to you, including e-mail: (i) stop offering the Service and/or rental Equipment, (ii) modify the Service and/or any of the terms and conditions of this Agreement, and/or (iii) reduce MRCs and NRCs.  Please check such Web site and your e-mail regularly for changes.

> (b) upon 30 days notice to you: (i) increase MRCs and/or NRCs or (ii) change this Agreement or the Service in a way that directly results in a material and adverse economic impact to you.  Qwest may reduce the foregoing notice period where commercially reasonable and/or if such increase is based upon Regulatory Activity.

> Your continued use of the Service and/or Equipment constitutes acceptance of
> those changes.  You must immediately stop using the Service and Equipment and
> cancel your Service if you do not agree to the changes.  Any changes or other
> terms you make to this Agreement or propose in any other documents, written or
> electronic, are void.

*See* Exhibit A (doc. #138-2) attached to Plaintiffs' Response to Defendants' Motion to Compel

Arbitration.  Plaintiffs construe the foregoing provision as establishing "no restrictions, temporal

or otherwise" on Qwest's ability "to change the existence, scope or terms of the Dispute

Resolution."  *See* Plaintiffs' Response to Defendants' Motion to Compel Arbitration, at 10-11.

Defendants, on the other hand, suggest that the Subscriber Agreement does not give Qwest an

"unfettered right" to change the scope and existence of the arbitration clause because such a

change invariably would have a material and adverse economic impact on the subscribers, thus

requiring 30 days advance notice.  Qwest also insists that its rights under Section 4 have no

practical effect on the named Plaintiffs as they terminated their high speed internet service and,

therefore, the Qwest Defendants were bound by the arbitration provision in effect as of the date

the service was terminated.

In determining whether the arbitration provision in the Subscriber Agreement is illusory,

my analysis must start with a consideration of applicable state law principles.  *Cf. White v. Four

B Corp.*, 2011 WL 4688843, at *2 (D. Kan. 2011).  Because a contract requires a bargained-for

benefit or detriment, "words of promise which by their terms make performance entirely optional

with the 'promisor'" cannot serve as consideration for an enforceable agreement, and any

purported "agreement" would be illusory.  Stated differently, an illusory contract is said to lack

mutuality of obligation.  *But see DeFeyter v. Riley*, 606 P.2d 453, 454 (Colo. App. 1979)

(holding that "[a] promise exchanged for a promise imposes mutual obligations and is sufficient

consideration to render the contract enforceable"). At the heart of the mutuality requirement is

the notion of fundamental fairness.

This court, once again, must look to Colorado common law principles for guidance in

applying the doctrine of mutuality.[4]

> In the context of arbitration agreements, states are split on what the term
> "mutuality" means. Most states (e.g., Colorado, Illinois,[5] New York[6]) consider an
> arbitration clause to be mutual if the agreement as a whole evidences an exchange
> of promises, whatever the promises are. Other states . . . consider an arbitration
> clause to be mutual only when each party agrees that all of its claims against the
> other shall be arbitrable. That is to say, the arbitration must be bilateral. If one
> party preserves the right not to arbitrate certain claims, then it is not bilateral and
> there is no mutuality.

*Veliz v. Cintas Corp.*, 2004 WL 2452851, at *12 (N.D. Cal. 2004), *order modified on*

*reconsideration on other grounds by* 2005 WL 1048699 (N.D. Cal. 2005). In Colorado, "every

contractual obligation need not be mutual as long as each party has provided some consideration

to the contract." *Rains v. Foundation Health Systems Life & Health*, 23 P.3d 1249, 1255 (Colo.

App. 2001). Thus in *Rains,* where the defendant agreed to provide medical insurance coverage

and the plaintiff agreed to pay premiums for that coverage, the Colorado Court of Appeals

suggested that an arbitration provision was not unfair or unenforceable "simply because it does

---

[4]It is worth noting that in advancing their argument that the arbitration provision is
illusory, Plaintiffs' Response brief does not cite to a single Colorado state court decision.

[5]*See, e.g., Molton, Allen & Williams, LLC v. Continental Casualty Insurance Co.,* 2010
WL 780353, at *5-6 (N.D. Ill. 2010) (noting that under controlling Illinois law, an arbitration
provision that compelled one party to submit all disputes to arbitration while allowing the other
party the choice of pursuing arbitration is not invalid for lack of mutuality of remedy or
obligation where the broader contract was supported by consideration).

[6]*See, e.g., Sablosky v. Edward S. Gordon Co.,* 535 N.E.2d 643, 646 (N.Y. Ct. App.1989)
("Mutuality of remedy is not required in arbitration contracts. If there is consideration for the
entire agreement that is sufficient; the consideration supports the arbitration option, as it does
every other obligation in the agreement.")

not require defendant to arbitrate." *Id.  See also Bonanno v. Quizno's Franchise Co., LLC*, 2009 WL 1068744, at \*21 (D. Colo. 2009) (noting Colorado does not require bilaterality for a contract to be enforceable and therefore a class action bar that worked solely or primarily to defendant's advantage did not render that provision substantively unfair).

In this case, I find that Plaintiffs and Qwest each made promises under the terms of the Subscriber Agreement.  Under the Price for Life program, Defendants promised to provide the Plaintiffs with high speed internet service at a guaranteed discounted rate, in return for Plaintiffs' promise to make required monthly payments and not change their internet service for at least two years.  These mutual promises were sufficient under Colorado law to make the Subscriber Agreement enforceable.  *See City of Colorado Springs v. Mountain View Electric Association, Inc.*, 925 P.2d 1378, 1383 (Colo. 1995) ("A promise exchanged for a promise imposes mutual obligations and is sufficient consideration to render a contract enforceable.").  *Cf. Teter v. Glass Onion, Inc.,* 723 F. Supp. 2d 1138, 1159 (W.D. Mo. 2010) ("Consideration is found where both parties have obligated themselves by mutual promises that impose some legal duty or liability on each promisor.").  Under Colorado law, the arbitration provision is enforceable even if that particular clause lacks mutuality, and therefore the arbitration provision is not illusory.

While Colorado law disposes of Plaintiffs' "mutuality" argument, I would be remiss in not addressing Plaintiffs' reliance on the Tenth Circuit's decision in *Dumais*.  For the following reasons, I find that *Dumais* is distinguishable.

The district court in *Dumais* held that the arbitration agreement in that case was not enforceable because it did not apply equally to both the plaintiff-employee and the defendant-employer.  *Dumais v. American Golf Corp.*, 150 F. Supp. 2d at 193.  In support of that holding,

30

the district court relied exclusively on *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir. 1997). Upon closer examination, however, it is clear that the Seventh Circuit reached its decision in *Gibson* by applying Indiana law and took pains to acknowledge that "we need look no further than the state law of contracts that generally governs arbitration agreements." *Id.* at 1130. Two of the three appellate decisions cited with favor by the Tenth Circuit in *Dumais*, 299 F.3d at 1219, explicitly turn on an application of the common law of the forum state. *See Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000) (applying Kentucky and Tennessee common law); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d at 1130 (applying Indiana common law). Obviously, the trial and appellate courts in *Dumais* had no reason to consider Colorado's interpretation of the mutuality requirement in deciding a case involving parties in the District of New Mexico.

I take further guidance from the Tenth Circuit's post-*Dumais* decision in *Hardin v. First Cash Financial Services, Inc.*, 465 F.3d at 470. In that case, the defendant moved to compel arbitration after a former employee sued her employer for sex discrimination. The arbitration provision in question gave the employer the unilateral right to terminate the parties' agreement "and/or to modify or discontinue the [dispute resolution program]." *Id.* at 478. The employer's right, however, was subject to a ten-day notice requirement. The defendant in *Hardin* also was precluded from amending the agreement if it had actual notice of a potential dispute or claim, or as to any claims that arose before the date of termination or amendment of the agreement or dispute resolution program.[7] The Plaintiff in *Hardin* argued that the dispute resolution program

---

[7]The court has not been provided with any evidence suggesting that Qwest ever attempted to modify the arbitration provision prior to Plaintiffs' initiating the instant lawsuit.

was illusory by virtue of the unilateral discretion accorded the employer.

The Tenth Circuit began its analysis in *Hardin* by acknowledging that it should "apply ordinary state law principles that govern the formation of contracts." *Id.* at 475. The appellate court then looked to the law of the forum state, Oklahoma, in concluding that "an arbitration agreement allowing a defendant company the unilateral right to modify or terminate the agreement is not illusory so long as reasonable restrictions are placed on this right." *Id.* at 479. The Tenth Circuit also distinguished its earlier decision in *Dumais* by noting that the defendant in *Hardin* did not have an "unfettered right" to modify the arbitration provision by virtue of the notice provisions. *Cf. Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 1743-74 (5th Cir. 2004) (declining to follow *Dumais* where the contracts in question gave the defendant companies the right to change the terms upon notice to the customer of the proposed changes); *Hancock v. American Telephone and Telegraph Company, Inc.*, 2011 WL 3626785, at *6-7 (W.D. Okl. 2011) (rejected a challenge to an arbitration provision as illusory after noting that the service provider was required to give customers advance notice of any material changes and that customers could reject any proposed change by terminating their service); *Lumuenemo v. Citigroup, Inc.*, 2009 WL 371901, at *5 (D. Colo. 2009) (holding that an arbitration agreement was not illusory where it gave the drafting party the right to modify the agreement under certain restrictions).

In this case, Section 4 of the Subscriber Agreement states that the Qwest Defendants' right to make material and adverse changes to the terms and conditions of that Agreement is conditioned upon prior notice and the subscriber's right to reject those changes by immediately discontinuing and cancelling their service. Given these restrictions, it would be incorrect to

characterize Section 4 as giving Qwest "unfettered rights" to change the terms of the Subscriber

Agreement or the arbitration provision.  For the foregoing reasons, I do not find that the

arbitration provision is illusory or unenforceable on that basis.

D.     *Is The Arbitration Clause Unconscionable?*

Plaintiffs argue that notwithstanding the Supreme Court's decision in *Concepcion*, this

court must independently determine whether the arbitration provision in the Subscriber

Agreement is unconscionable and, therefore, unenforceable under section 2 of the Federal

Arbitration Act.  *See* 9 U.S.C. § 2 (noting that an arbitration clause shall be valid and enforceable

"save upon such grounds as exist at law or in equity for the revocation of any contract').  *See*

*also Doctor's Associates, Inc. v. Casarotto*, 517 U.S. at 687 (holding that "generally applicable

contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate

arbitration agreements without contravening" the FAA).  More specifically, Plaintiffs contend

that the arbitration provision is procedurally unconscionable because it was presented on a "take

it or leave it" basis, Plaintiffs were not provided with an opportunity to read and become familiar

with the provision, and the provision was drafted in a way that would be difficult for a layperson

to comprehend.  Plaintiffs argue that the arbitration provision is substantively unconscionable

because:  (1) by permitting only individual arbitration or proceedings in small claims court,

Qwest "forecloses the most viable means for consumers to challenge Qwest's unlawful ETF"

(15); (2) "the small amounts at stake would make challenges to Qwest's ETF very difficult for

consumers," even if the Subscriber Agreement had imposed fair terms for individual arbitrations;

(3) the totality of the dispute resolution provisions make the Agreement substantively unfair; (4)

the Subscriber Agreement interferes with the public policy of protecting consumers; and (5) the

dispute resolution provision is not commercially reasonable.

In determining whether contract defenses, such as unconscionability, may be invoked to invalidate an arbitration provision, federal courts look to applicable state law for guidance.  *See, e.g., Jaimez v. MBNA America Bank, N.A.*, 2006 WL 470587, at \*3 (D. Kan. 2006) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1087)).  In *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct at 1746, the Supreme Court noted that under California law, a finding of unconscionability requires "procedural" and "substantive" elements, "the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results."  Colorado law similarly holds that both procedural and substantive unconscionability are required for a contract to be unenforceable.

> In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties *together with* contract terms which are unreasonably favorable to that party.

*Davis v. M.L.G Corp.*, 712 P.2d 985, 991 (Colo. 1986) (citing California precedents) (emphasis added).  *See also Bailey v. Lincoln General Insurance Co.*, 255 P.3d 1039, 1055 (Colo. 2011) (noting that "[a] party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability").  During the oral argument on October 7, 2011, Plaintiffs' counsel conceded that his clients were required to show that the Qwest arbitration clause is both procedurally and substantively unconscionable.  The issue of unconscionability raises a question of law for which Plaintiffs bear the burden of persuasion.  *Cf. Bernal v. Burnett*, 2011 WL 2182903, at \*4 (D. Colo. 2011).  This court finds that Plaintiffs have not sustained that burden.

The Colorado Supreme Court has suggested that substantive unconscionability might be

demonstrated where there is an "absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated" or where the terms of the contract suggest a lack of "substantive fairness." *Davis v. M.L.G Corp.*, 712 P.2d at 991.  The foregoing elements do not characterize the arbitration provision in this case.  While Plaintiffs are precluded from pursuing relief on a class-wide basis, that limitation does not establish substantive unconscionability.  *Cf. Hancock v. American Telephone and Telegraph Company, Inc.*, 2011 WL 3626785, at *8  (W.D. Okl. 2011) (holding that a clause prohibiting the customer's participation in class action or class arbitration proceedings does not render the clause unenforceable or unconscionable); *Enderlin v. XM Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *13 (E.D. Ark. 2008) (concluding that the inclusion of a class-action waiver in an arbitration clause did not make the provision unconscionable).  Plaintiffs' argument that the small amounts at stake make pursuing relief on an individualized basis difficult and commercially unreasonable also is unavailing.  *Cf. Bonanno v. Quizno's Franchise Company, LLC*, 2009 WL 1068744, at *20-21 (refusing to find that a franchise agreement was substantively unfair simply because individual lawsuits might be more expensive or because the class action bar might potentially benefit the franchiser at the expense of the franchisees).  Finally, Plaintiffs maintain that the totality of the dispute resolution provisions make the Agreement substantively unfair and contrary to public policy.  *But see AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. at 1749-51 (observing that "[a] prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results'" and suggesting that "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration - its informality- and makes the process slower, more costly, and more likely to generate procedural morass than final judgment").  In sum, Plaintiffs'

claim of substantive unfairness attempts to resurrect policy arguments rejected by the majority in

*Concepcion.* Those arguments have no more traction under the facts of this case.

Plaintiffs' procedural unconscionability challenge is equally unpersuasive. Factors that

may point to procedural inequities include:

> a standardized agreement executed by parties of unequal bargaining power; lack
> of opportunity to read or become familiar with the document before signing it;
> use of fine print in the portion of the contract containing the provision; . . . the
> relationship of the parties, including factors of assent, unfair surprise, and notice;
> and all the circumstances surrounding the formation of the contract, including its
> commercial setting, purpose and effect.

*Davis v. M.L.G Corp.*, 712 P.2d at 99 (internal citations omitted). While it cannot be disputed

that the Subscriber Agreement and arbitration provision were prepared by Qwest and offered on

a "take it or leave it" basis, those characteristics, without more, do not suffice to qualify the

Subscriber Agreement as a contract of adhesion under Colorado law. *Cf. Clinic Masters, Inc. v.*

*District Court In and For El Paso County,* 556 P.2d 473, 475-76 (Colo. 1976) (noting, for

example, that the respondent could have obtained comparable services elsewhere and was

advised of all the terms of the contract before entering it). *See also Bar-Ayal v. Time Warner*

*Cable, Inc.*, 2006 WL 2990032, at *16 ("[m]ere inequality in bargaining power . . . is not a

sufficient reason to hold that arbitration agreements are never enforceable").

As noted previously, Plaintiffs' arguments regarding notice and assent are not supported

by the material facts in this case. Plaintiffs had a reasonable opportunity to become familiar with

the terms and conditions of the Subscriber Agreement, having received multiple communications

that alerted them to the existence of the arbitration provision and limitations on Qwest's liability.

*Cf. Bernal v. Burnett*, 2011 WL 2182903, at * 6-7 (holding that the parties' arbitration agreement

was not unconscionable, notwithstanding the fact that the provision was set forth in a

standardized agreement prepared exclusively by the defendants and that plaintiffs had submitted

affidavits stating they were not aware of the arbitration provision or did not remember seeing the

arbitration provision; noted the absence of any evidence that the plaintiffs "were subject to

significant external pressure driving them to sign the documents without taking time to review

them and/or have someone else review them").

I find that Plaintiffs have failed to carry their burden of persuasion as to both the alleged

procedural and substantive unconscionability of the arbitration provision in the Subscriber

Agreement. *Cf. Swift v. Zynga Game Network, Inc.*, 2011 WL 3419499, at *10 (holding that

plaintiff's opposition to defendants' motion to compel arbitration failed based upon her inability

to show both procedural and substantive unconscionability).

E.      *Have the Qwest Defendants Waived Their Arbitration Rights?*

Finally, Plaintiffs contend that the Qwest Defendants waived any right to arbitration

established under the Subscriber Agreement by first filing a motion to dismiss in the Western

District of Washington, and then filing a motion to dismiss after the action was transferred to the

District of Colorado.  Defendants counter that they have repeatedly asserted their rights to

arbitrate and that Plaintiffs have not suffered any prejudice from Qwest's litigation approach.

It is well-settled that a party may waive their rights under an arbitration clause. *Metz v.

Merrill, Lunch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1489 (10th Cir. 1994).  In assessing a

claim of waiver, the court should consider

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2)
> whether "the litigation machinery has been substantially invoked" and the parties
> "were well into preparation of a lawsuit" before the party notified the opposing
> party of an intent to arbitrate; (3) whether a party either requested arbitration
> enforcement close to the trial date or delayed for a long period before seeking a
> stay; (4) whether a defendant seeking arbitration filed a counterclaim without

asking for a stay of the proceeding; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place;" and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* While these factors are instructive, "there is no bright line to assist a court in determining whether a party has waived arbitration." *Coxcom, Inc. v. Egghead Telecom, Inc.*, 2009 WL 4016629, at *5 (N.D. Okl. 2009). Any "doubts concerning whether there has been a waiver are resolved in favor of arbitration," and "waiver is not lightly inferred." *Id.*

Plaintiffs' waiver argument must, in the first instance, be measured against the court's own docket. Within approximately two months of the filing of the initial Complaint in the Western District of Washington on October 15, 2008, the Qwest Defendants simultaneously filed a Motion to Stay Proceedings and Compel Arbitration (doc. #1-36), a Motion to Dismiss (doc. #1-34) and a Motion to Transfer (doc. #1-33). *Cf. Gratzer v. Yellow Corp.*, 316 F. Supp. 2d 1099, 1105 (D. Kan. 2004) (declining to find waiver where defendant moved to compel arbitration and either dismiss or stay the action within two months of the complaint being filed). On December 19, 2008, the parties filed a proposed Stipulation and Order (doc. #1-40) under which the parties would "engage in discovery limited to issues relevant to the enforceability of the arbitration clause in the Defendants' Subscriber Agreement." The court in the Western District of Washington entered an order on January 9, 2009 establishing a schedule for briefing the pending motions and conducting discovery limited to the Motion to Compel Arbitration. After Plaintiffs filed their First Amended Complaint and Defendants filed new Motions to Dismiss and to Transfer, the Western District of Washington issued an Order (doc. #1-60) staying all discovery and precluding the Qwest Defendants from filing "any motion to compel arbitration until after the Court rules on the pending motions to dismiss and/or transfer." *Cf.*

*Baker v. Conoco Pipeline Co.*, 280 F. Supp. 2d 1285, 1300 (N.D. Okl. 2003) ("Compliance with court-imposed deadlines does not support a waiver of arbitration rights.").

On August 17, 2009, the parties filed in this court a Stipulated Motion to File Second Amended Complaint and Motion to Compel Arbitration (doc. #13).  Under the parties' proposed stipulation, Plaintiffs were given until September 1, 2009 to file a Second Amended Complaint, while Defendants were permitted until "September 15, 2009, to file their Motion to Compel Arbitration or other response to the Second Amended Complaint."  The Qwest Defendants filed that Motion to Compel Arbitration (doc. #26) on September 15, 2009.  On October 9, 2009, the parties submitted a proposed Scheduling Order (doc. #40) that specifically requested, for purposes of judicial economy and efficiency, that this court "limit discovery and proceedings in this matter to facts and issues related to Qwest's Motion to Compel Arbitration."  On October 27, 2009 the parties filed a Joint Motion for Extension and Stipulation Concerning Motion to Amend (doc. #48), in which they proposed that Plaintiffs be permitted to file a Third Amended Complaint, that Defendants' then-pending Motion to Compel Arbitration (doc. #26) apply to the Third Amended Complaint, and that Defendants not be required to file a responsive pleading directed to the Third Amended Complaint until there was ruling on the pending Motion to Compel Arbitration.  I granted that Joint Motion on November 2, 2009.

Measuring the *Metz* factors against the procedural history of this case, I am hard pressed to find any objective or legal basis upon which to grant Plaintiffs' waiver challenge.  Since the action commenced in October 2008, the Qwest Defendants have filed no less than three motions to compel arbitration.  Rather than pursuing a strategy of undue delay or invoking the Subscriber Agreement's arbitration provision only after the parties were well-invested in the pretrial

process, the Qwest Defendants joined in a proposed stipulation (within 65 days of the filing of

the original Complaint) under which the parties agreed to limit discovery to issues relevant to the

enforceability of the arbitration clause.  More to the point, there is no reason to believe, and no

facts to show, that Plaintiffs have been misled or suffered any prejudice from the Qwest

Defendants' repeated efforts to enforce the arbitration provision in the Subscriber Agreement.

Put more simply, Plaintiffs have failed to marshal any facts or legal arguments that would

warrant a finding of waiver.  *Cf. Peterson v. Shearson/American Express, Inc.*, 849 F.2d 464,

466 (10th Cir. 1988) (noting that a party asserting a waiver of arbitration has a "heavy burden of

proof").

**CONCLUSION**

Accordingly, for the foregoing reasons, this court will GRANT the Qwest Defendants'

Renewed Motion to Compel Arbitration (doc. #132), and stay this matter pending further

proceedings.

DATED this 8th day of March, 2012.

BY THE COURT:

s/ Craig B. Shaffer
United States Magistrate Judge

40